record. This claim is based on the facts set forth in the seventh paragraph in the complaint. For this reason the defendants Bayles and Sumner are proper parties to the action.

In the prayer it is asked by plaintiff "that the defendants account to plaintiff, and pay over the $500 paid in by him on account of such subscription." If plaintiff had only asked that the defendant the Sanitary Security Company account, etc., the complaint would not be open to objection, even if defendant is correct in his contention that Bayles and Sumner are not liable in this action to account to plaintiff. The demurrer is taken by reason of a single claim in the prayer for relief. Conceding that the plaintiff has asked for greater relief than he is entitled to, the defendant cannot demur on the ground that two causes of action are improperly united. As said before, there is only one cause of action set up in the complaint, and that is equitable. If the plaintiff fails on the trial to make out a cause of action in equity against Bayles and Sumner, he cannot then recover on a cause of action purely legal. His complaint will be dismissed, or at least no relief will be given against them. Bradley v. Aldrich, 40 N. Y. 504; Wheelock v. Lee, 74 N. Y. 495, 500. If the relief demanded is incorrect or excessive, it is not good ground for demurrer. Emery v. Pease, 20 N. Y. 62; Wetmore v. Porter, 92 N. Y. 76, 80; Pierson v. McCurdy, 61 How. Prac. 134.

The plaintiff contends that the defendants Bayles and Sumner are liable to account in this action, as well as the corporation, for the amount paid on the subscription. In view of my conclusion, it is not necessary to decide the question.

Demurrer overruled, with costs, with leave to defendant to answer in 20 days on payment of costs.

Argued before BROWN, P. J., and PRATT, CULLEN, BARTLETT, and HATCH, JJ.

Berry Bros., for appellant.

James McKeen, for respondent.

PER CURIAM. Judgment affirmed, with costs, upon the opinion of the special term.

<hr/>

(5 App. Div. 529.)

## SELPHO et al. v. CITY OF BROOKLYN.

(Supreme Court, Appellate Division, Second Department. May 8, 1896.)

1. MUNICIPAL CORPORATIONS—BIDS FOR PUBLIC IMPROVEMENTS—MATERIAL.
    Laws 1888, c. 583 (Brooklyn City Charter) tit. 13, § 1, provides that whenever any improvement shall be declared necessary the council shall authorize the department of city works to advertise for bids under seal, which bids shall be publicly opened and announced, with the name of the bidder, the amount proposed, "and the names of the sureties." *Held*, that such provision required security to .be given with every bid, such security to be a guaranty of the bid as well as of the performance of the contract if awarded to the bidder.

2. SAME—AMOUNT AND FORM OF BOND.
    Where a city charter required security to be given by a bidder for public improvements, but there is no provision as to the amount of the bond, or as to its form, or whether it was to be furnished with the bid, or after its acceptance, regulation of such matter is left to the officers who are to receive the bid.

Appeal from city court of Brooklyn, trial term.

Action by Edwin P. Selpho and William E. Selpho against the city of Brooklyn to recover the sum of $1,924.60, with interest, being the amount claimed to have been paid by plaintiffs for certain assess-

ments alleged to be invalid. There was a judgment in favor of defendant, and plaintiffs appeal. Affirmed.

The opinion of Judge CLEMENT in the city court is as follows:

This action is brought to recover the amount paid the city for certain assessments for local improvements, alleged to have been discovered to be invalid for jurisdictional errors, though regular on their face. The plaintiffs only claim a single jurisdictional error in the several assessments. Counsel have submitted the pleadings in the matter of the grading and paving of Thirty-Fifth street from Third to Fourth avenue, and the proceedings in the other assessments were similar in form. The defect complained of is that restrictions were imposed on bidders for the work, not authorized by law. In the advertisement for proposals for the work on Thirty-Fifth street, the commissioner of city works inserted certain provisions, which action is claimed to have been illegal.

I will first consider the provision as to the security required. Title 13, § 1, of the Revised Charter,[1] provides, inter alia: "Whenever any work, materials or improvements shall have been duly declared to be necessary by said common council, they shall authorize the department of city works, and it shall be the duty of the department so authorized to advertize in the corporation newspapers, for at least ten days, inviting bids or proposals therefor, under seal, to be sent to the department of city works, which bids or proposals shall be publicly opened and announced, with the name of the bidder, the rate or amount proposed, and the names of the sureties, which sureties shall be the owners of real estate in the city of Brooklyn in their own right to the amount of such surety, and shall have held the same for at least one year prior to becoming such surety; and before awarding any contract all the bids or proposals received shall be published for at least six days in the newspapers aforesaid." This is the only provision in the charter which has any reference to the taking of security for the performance of contracts made with the city of Brooklyn; and, further, no ordinance has ever been passed providing for the taking of bonds. The legislature, by the section quoted from, recognized the necessity of security, and provided as to the qualifications of the sureties. In the absence of any statute or of any ordinance providing as to the amount of the bond, or as to its form, or whether it should be furnished with the bid, or after its acceptance, it would seem to me to be left to the wise discretion of the commissioner of city works. He was bound to take security, for that is required, by inference from the above section. In the exercise of his discretion, the commissioner had no right to impose any restrictions which would prevent fair and honest competition. It will be noticed, in section 1, that the expressions, "name of the bidder," and "names of the sureties," are used. If the legislators only meant that the names of the proposed sureties should be given, they would have so said. It seems to me clear that security was required to be given when the proposal was submitted, which security should be a guaranty of the bid, as well as of the performance of the contract if awarded to the bidder. The commissioner of city works, in the proceeding under consideration, fixed the amount of the bond at $1,750, which was only one-half the estimated cost of the work, and required the sureties to agree that, if the contract was awarded to the party proposing, they would become bound, as sureties, for its faithful performance, and in case the bidder failed to execute the contract, if awarded to him, the sureties would pay the difference between the price proposed, and the price at which the contract might be made with any other person. If the commissioner of city works had the power to determine as to the amount of the bond, and its form, I am of opinion that the property owners cannot complain, for it would seem that the commissioner did nothing except what was for their best interests.

The provision in the advertisement calling on bidders for a deposit of 5 per cent. is expressly authorized by an ordinance, and is not in contravention of any provision of the charter. Such an ordinance was passed under authority of the general welfare clause in the powers granted to the common

[1]Laws 1888, c. 583.

council, and, up to 1888, section 3 of chapter 721 of the Laws of 1865 was in force, by which it was made a misdemeanor to put in a straw bid. This section was omitted in the charter of 1888, and the ordinance was passed for the good reason that a cash deposit was more effective to prevent fictitious bidding than the fear of prosecution for a misdemeanor.

I conclude that the proceedings of the commissioner of city works were not in conflict with the law, and that there is no irregularity in the assessments. Judgment for defendant, with costs.

Argued before BROWN, P. J., and PRATT, CULLEN, BARTLETT, and HATCH, JJ.

Sidney V. Lowell, for appellants.
Joseph A. Burr, for respondent.

PER CURIAM. Judgment affirmed, with costs, upon the opinion of the special term.

---

(6 App. Div. 12.)

PALMER v. LARCHMONT ELECTRIC CO.

(Supreme Court, Appellate Division, Second Department. June 2, 1896.)

1. EMINENT DOMAIN—COUNTRY ROADS—OCCUPATION BY ELECTRIC LIGHT POLES.
   The occupation of a country road, the fee of which belongs to the abutting owners, by an electric light company, for the purpose of erecting its poles, is an additional burden, for which the owners of the fee are entitled to compensation.

2. SAME—DIFFERENCE BETWEEN CITY AND COUNTRY HIGHWAYS.
   The easements of the public in streets of cities and incorporated villages are greater than in country roads.

3. SAME—DENSITY OF POPULATION.
   The right of an abutting owner in a country road of which he owns the fee is not affected by the density of the population of the particular locality.

Appeal from Westchester county court.

Action by William D. Palmer against the Larchmont Electric Company. From a judgment entered on a decision in favor of plaintiff, defendant appeals. Affirmed.

Argued before BROWN, P. J., and PRATT, CULLEN, BARTLETT, and HATCH, JJ.

Wm. Sam. Johnson, for appellant.
Wm. Porter Allen, for respondent.

BROWN, P. J. This appeal presents the question whether an electric company, having a contract with the proper town authorities to light a public highway, may erect poles and wires upon said highway without the consent of the abutting owners. In Eels v. Telegraph Co., 143 N. Y. 133, 38 N. E. 202, the court of appeals decided that neither the state nor any corporation could appropriate any portion of a rural highway by setting up poles for the support of telegraph or telephone wires. That decision was based upon the fact that the fundamental idea of a highway was a place for the uninterrupted passage of men, animals, and vehicles, and to afford light, air, and access to the property of abutting owners; that in the latter respect an abutting owner had a greater interest in the highway